IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| KENYATA BRYANT,<br><br>    Plaintiff,<br><br>v.<br><br>CHRIS JANOVSKY, CHRIS CARPENTER, ADAM ANDERSEN, JEREMY GILMER, and CITY OF MANCHESTER, GEORGIA,<br><br>    Defendants. | CIVIL ACTION FILE<br><br>NO. 3:22-cv-160-TCB |

## O R D E R

This case comes before the Court on Defendants Chris Janovsky, Chris Carpenter, Adam Andersen, Jeremy Gilmer and City of Manchester, Georgia's motion [25] for summary judgment.

### I.  Background

At around 10:00 a.m. on January 12, 2022, Sidney Gary flagged down Defendant Carpenter of the City of Manchester Police Department. Gary told Carpenter that he wanted to make the police

department aware that he had been receiving threats from an individual. During this interaction, Gary did not tell Carpenter the name of the individual making threats.

At approximately 12:30 p.m. that same day, Gary called the police department and reported that the individual called him and was threatening to come speak with him at the local barber shop. He believed the individual may have a gun.[1] Gary provided a description of the individual's person and car.

At around 1:13 p.m., while on patrol, Defendant Janovsky saw an individual and a car matching the description that Gary provided. At that time, the individual (later identified as Plaintiff Kenyata Bryant) was speaking with Gary outside of the barber shop. Defendant Janovsky called dispatch to confirm the information that Gary provided and asked for additional officers to come to the scene.

---

[1] Whether Gary specifically mentioned that Bryant may have a gun is a disputed fact. However, it is undisputed that Janovsky called dispatch to determine what Gary reported to dispatch during his call, and it was discussed that "it was reported to the officers that it was possible that a gun would be present." [25-1] ¶ 24.

Defendants Carpenter, Gilmer, and Andersen joined Janovsky at the scene. The fifteen-minute, thirty-three second incident was captured on bodycam video and provided to the Court.[2]

As the officers approached, Gary denied calling the police and told them that everything between him and Bryant was fine. But Janovsky spoke to Gary out of Bryant's earshot, and Gary confirmed that he had made the earlier call. Meanwhile, Bryant was in the background filming the interaction with his cell phone and asking the officers if he was being detained.

After a few minutes of speaking to Gary, Andersen and Gilmer went to speak with Bryant to ask for his identification to conduct a wants/warrant check. During this conversation, Bryant continued to be disruptive and repeatedly asked the officers if he was being detained. At one point, he tried to walk into a nearby store, but the officers told him to stay where he was while they investigated. Bryant did not know that the officers were there because of Gary's previous report.

Originally, Andersen told Bryant he was not being detained but that he needed his information to complete the report and investigate

---

[2] *See* [27].

3

whether any criminal act occurred. After several minutes of refusing and asserting his rights, Bryant continued to ask whether he was being detained. At this point, the officer confirmed that he was being detained until he provided his identification.

Bryant was not threatened by the police at any time during the conversation, and no officer pulled out their gun, handcuffs, or taser. Bryant ultimately provided his identification, and the wants/warrant check returned negative results. Bryant was told he was free to leave. The officers then left.

On September 15, 2022, Bryant filed this lawsuit, contending that he had been illegally detained by the City of Manchester Police Department during the January 12, 2022, incident.

On January 1, 2024, Defendants collectively filed this motion [25] for summary judgment.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* (citation omitted). Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.* (citation omitted).

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 331). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* (citations omitted). At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (per curiam) (quoting *Celotex Corp.*, 477 U.S. at 324).

### III.  Discussion

Bryant contends that he was illegally detained by the Defendants when he was told that he was not free to leave. In his deposition, he stated that "at that point I was being illegally detained because I [was] supposed to [be] able to go freely if I hadn't broken [any] law." [26] at 48.

Defendants contend that they are entitled to summary judgment on all counts of Bryant's complaint. Specifically, they contend that (1) Bryant has failed to establish a violation of his Fourth Amendment rights; (2) Defendants Carpenter, Gilmer, Anderson, and Janovsky are entitled to qualified immunity and official immunity; and (3) Defendant

City of Manchester is not liable under Georgia law because, under O.C.G.A. § 36-33-3, a municipality cannot be held liable for the acts of police officers in the exercise of their duties imposed by law. Plus, Bryant failed to serve the City with an ante litem notice within six month of the incident.

Bryant responds that Defendants are not entitled to immunity because they violated a clearly established law (the Fourth Amendment) by detaining him without reasonable suspicion.

### A.   Qualified Immunity and Federal Claim

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (per curiam) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Bryant concedes that Defendants were acting within the scope of their discretionary duties during the interaction. Thus, the burden shifts to him to show that qualified immunity should not apply, i.e., that "(1) the defendant violated a constitutional right, and (2) this right

was clearly established at the time of the alleged violation." *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014) (per curiam) (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)).

Bryant also does not dispute that Defendants needed only reasonable suspicion to conduct the investigatory stop.

Although the Fourth Amendment protects people from unreasonable searches and seizures, "[b]rief investigative stops have long been recognized as reasonable, at least under appropriate circumstances." *United States v. Bruce*, 977 F.3d 1112, 1116 (11th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Officers 'may briefly detain a person as part of an investigatory stop if they have reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity.'" *Id.* (quoting *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995)). Specifically, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted).

"To have reasonable suspicion, an officer needs 'at least a minimal level of objective justification for making the stop.'" *Bruce*, 977 F.3d at 1116 (quoting *Wardlow*, 528 U.S. at 123). It requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

"Reasonable suspicion is determined from the totality of the circumstances and collective knowledge of the officers." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (citing *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004)). Importantly, an officer "who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1165–66 (11th Cir. 2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id.* at 1166 (citations omitted).

Bryant contends that the officers "did not have arguable reasonable suspicion to detain[] [him] because they were told by Mr. Gary . . . that Mr. Bryant had committed no crimes." [28] at 5. But the undisputed material facts and the bodycam footage indicate otherwise.

"In the context of cases involving video evidence, this Court will accept the video's depiction over the opposing party's account of the facts where the video obviously contradicts that version of the facts." *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (per curiam) (citation omitted); *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022).

Although not captured on the bodycam footage, it is undisputed that Gary flagged down Defendant Carpenter while he was on patrol and provided a description of Bryant's person and car. And even though Bryant disputes that Gary called dispatch to make a report about him, the bodycam video shows the officers speaking to Gary about the call. In the early minutes of the interaction, Gary tells the officers that he did not say that Bryant had a gun, but one of the officers clarifies that Gary had reported to be on the lookout for Bryant because "he didn't want any trouble and [] he didn't know if there were going to be any

weapons." [27] at 03:15–03:35. Bryant was standing immediately next to the officer who made this statement and made no effort to correct the officer's statement.

Further, any dispute regarding whether Gary specifically mentioned that Bryant would have a gun or weapon is irrelevant to the analysis. "The protection of qualified immunity applies regardless of whether the government official's error is . . . a mistake of fact." *Fugua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (quotation omitted). And the officers did not simply rely on their memory of what the report mentioned when investigating. The video shows that Defendant Janovsky called dispatch to confirm the information about the reported threats. And, over the radio, the officers heard "that it was possible that a gun would be present." [25-2] at 5.

Additionally, Bryant contends that any reasonable suspicion that may have been present was dispelled because Gary told the police that everything was okay. The Court disagrees. "The 'absence of additional suspicious conduct' when the police arrive [does] not 'dispel the reasonable suspicion' of criminal activity." *Bruce*, 977 F.3d at 1119 (quoting *Navarette*, 572 U.S. at 403). Like the Eleventh Circuit clarified

11

in *Bruce*, although "it is true that the officers did not see [Bryant] acting unlawfully—[] it is also true that they did not need to." *Id.* Only a few hours had passed since Gary had reported his concerns when the police saw Bryant speaking with Gary. And although Gary did originally tell the police that everything was fine, "it is undisputed [that he] admitted to contacting the police even though [he] initially . . . denied making a call to the police department in hopes of not upsetting an apparent newly found peace with Bryant." [29] at 6.

This is not a situation where the police conducted an investigatory stop based on nothing more than a tip. And this is not a case where the tip was anonymous. *See Alabama v. White*, 496 U.S. 325 (1990) (holding that even an anonymous tip to the police can give rise to reasonable suspicion for police to make an investigatory stop if the tip is corroborated by independent police work).

Here, we have someone who, by name, reported his concerns to the police. Unlike cases with anonymous tipsters, Gary's call has an inherent level of veracity because his "reputation can be assessed and [he] can be held responsible if [his] allegations turn out to be

fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citation omitted).[3] But even if Gary had remained anonymous, the call would still present "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop" because the information he provided was corroborated by the police. *Id.* (quoting *White*, 496 U.S. at 327).

A few hours after Gary reported his concerns to the police, the man (and the vehicle) matching the description provided was seen outside of Gary's business. This alone is sufficient to find reasonable suspicion.

The officers' actions were reasonable and proportional to the concerns triggered by Gary's call. *See Acosta*, 363 F.3d at 1145 (explaining that the second part of the reasonableness of an investigative stop inquiry is "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place" (alteration in original) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985))). The encounter lasted only fifteen minutes and thirty-three seconds. *See id.* at 1148 (holding that a thirty-minute stop

---

[3] The Court notes that even if Gary had not recanted his denial, the officers were permitted to initiate a brief, investigatory stop to determine whether he had made a false police report, a crime under O.C.G.A. § 16-10-26.

Case 3:22-cv-00160-TCB   Document 30   Filed 04/29/24   Page 14 of 15

was a "reasonable duration for [a] *Terry* stop"). The officers never touched Bryant, never threatened him, never reached for their gun, taser, or handcuffs, and immediately left the scene when the warrant check came back clear. To the extent that Bryant was detained, the police did so "to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum interference." *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (per curiam).

The Court concludes that Defendants conducted a permissible investigatory stop that was supported by reasonable articulable suspicion and therefore did not violate Bryant's constitutional rights. As such, Defendants have qualified immunity, and their motion for summary judgment will be granted as to Bryant's federal § 1983 claim.

### B. Official Immunity and State Law Claims

Bryant's claims under state law similarly fail. He contends that the individual Defendants should be liable under Georgia's false imprisonment statute, O.C.G.A. § 51-7-20, because they had had "no arguable reasonable suspicion to believe [he] may have committed a crime." [28] at 8. The Court has already concluded that Defendants had
14

reasonable suspicion to detain Bryant.[4] Therefore, the Court will grant summary judgment to Defendants on Bryant's false imprisonment claim.[5]

## IV. Conclusion

For the foregoing reasons, Defendants' motion [25] for summary judgment is granted. The Clerk is directed to close this case.

IT IS SO ORDERED this 29th day of April, 2024.

_____
Timothy C. Batten, Sr.
Chief United States District Judge

---

[4] Defendants assert that Bryant needed to demonstrate that they acted with actual malice to lose their official immunity. Although the Court agrees with this statement of law, it is unnecessary to analyze whether Defendants acted with actual malice because the Court has concluded that Bryant's detention was lawful. *See Malone v. Johnson*, 667 F. Supp. 3d 1257, 1273–74 (N.D. Ga. 2023).

[5] This conclusion also applies to Bryant's false imprisonment claim against the City of Manchester for two reasons: (1) Bryant failed to respond to Defendants' argument that he failed to serve the City an ante litem notice pursuant to O.C.G.A. § 36-33-5 within six months of the event; and (2) Bryant failed to respond to Defendants' argument that O.C.G.A. § 36-33-3 bars municipalities from liability for any tort committed by policeman or other officers who were performing their duties imposed on them. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (per curiam) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (quotations and alterations omitted)).